UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

JOSE MARTINEZ a/k/a "Noelle,"

                   Defendant.

**DECISION AND ORDER**
10-CR-233S (1)

## I. INTRODUCTION

On July 11, 2014, a jury convicted Defendant Jose Martinez a/k/a "Noelle" of conspiring, in violation of 21 U.S.C. § 846, to possess with intent to distribute, and to distribute, 500 grams or more of cocaine and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(B). The jury acquitted Martinez and his three co-defendants of other federal crimes relating to the death of Quincy Turner. Sentencing is scheduled for August 24, 2016.

Presently before this Court are Martinez's objections to the Presentence Investigation Report ("PSR"). (Docket No. 601.) Because counsel are familiar with the facts and prior proceedings in this case, they will be discussed in detail only where necessary.[1] For the following reasons, Martinez's objections are denied.

## II. THE PSR

The PSR, last revised on August 15 , 2016, is a 37-page document that thoroughly recounts, among other things, Martinez's offense conduct (PSR, ¶¶ 5-29), his criminal

---

[1]For additional discussion of the facts and prior proceedings in this case, see United States v. Martinez, 146 F. Supp. 3d 497 (W.D.N.Y. 2015) (forfeiture) and United States v. Martinez, No. 10-CR-233S (1), 2015 WL 5673115 (W.D.N.Y. Sept. 25, 2015) (new trial).

history (PSR, ¶¶ 44-63), his personal and family information (PSR, ¶¶ 77-87), his employment history (PSR, ¶¶ 94-99), and his financial condition (PSR, ¶¶ 100-109).  It also contains Martinez's advisory sentencing guidelines calculation, based on the 2015 edition of the United States Sentencing Commission Guidelines Manual.  (PSR, ¶¶ 33-63.)

Martinez's advisory guidelines calculation begins with a base offense level of 43, which is the base offense level for drug-trafficking offenses that involve first degree murder, as set forth in § 2D1.1(d)(1),[2] which cross references § 2A1.1.  (PSR, ¶ 34.)  A four-level increase is then applied under § 3B1.1(a), on the basis that Martinez was the organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. (PSR, ¶ 37.)  This results in an adjusted offense level of 47, which is reduced to a total offense level of 43 under Chapter 5, Part A, Application Note 2, because 43 is the highest offense level in the sentencing table.  (PSR, ¶ 42.)

Next, Martinez's criminal history category is tabulated.  Martinez has three criminal history points, all stemming from his 1998 conviction for conspiring to possess with intent to distribute, and to distribute, cocaine and cocaine base.  (PSR, ¶¶ 51, 55).  Three criminal history points yields a criminal history category of II.  (PSR, ¶ 56.)

Based on these calculations, with a total offense level of 43 and a criminal history of II, Martinez's advisory guidelines sentencing range is life imprisonment.  (PSR, ¶ 65.) Martinez's statutory range is a minimum of 10 years to a maximum of life imprisonment. See 21 U.S.C. §§ 841(b)(1)(B) and 851.  The advisory guidelines range for supervised release is eight years under § 5D1.2(c), because that is the term of supervised release required by statute.  See 21 U.S.C. §§ 841(b)(1)(B) and 851.

---

[2]Unless otherwise noted, all advisory guidelines citations are to the 2014 edition of the Guidelines Manual.

### III.  DISCUSSION

Martinez lodges numerous individual objections to the PSR, though most of his objections simply express his disagreement with the Probation Officer's recitation of the offense conduct.  For example, Martinez argues that some paragraphs should be deleted as irrelevant, some should be modified to include his view of the evidence, and some should be corrected or stricken because they contain what Martinez views as incorrect or incomplete information.  (See Docket No. 601.)

None of these objections require individual rulings by this Court, since they do not directly affect the advisory guidelines calculations or Martinez's sentencing.  See Fed. R. Crim. Proc. 32(i)(3)(B).  The offense conduct portion of the PSR is intended to simply contain a general description of the offense conduct.  It is not intended to reflect advocacy or any party's particular interpretation of the evidence.  In any event, this Court presided over the trial and has its own independent recollection of the testimony and other evidence. This Court will, however, consider Martinez's comments in conjunction with considering the offense conduct in this case at the time of sentencing.

In addition to his general objections to the offense conduct summary, Martinez objects to the calculation of his total offense level.  He first objects to the calculation of his base offense level on the grounds that his relevant conduct does not include the murder of Quincy Turner, and therefore, the cross reference to the first degree murder guideline does not apply.  He next objects to the Probation Officer's failure to apply a 3-level downward adjustment based on his reduced role in the offense.  Finally, Martinez objects to the Probation Officer's failure to apply a 2-level downward adjustment for acceptance of responsibility.  Each objection is addressed in turn.

### A.    Base Offense Level

Section 1B1.1 of the Guidelines Manual dictates the order in which the guidelines provisions must be applied to determine the proper sentencing calculations. Pertinent here, it first requires that the offense guideline for the offense of conviction be determined pursuant to § 1B1.2.  <u>See</u> U.S.S.G. § 1B1.1 (a)(1).  Section 1B1.2(b) requires that, after determining the appropriate offense guideline section, the applicable guideline range be determined in accordance with § 1B1.3 (Relevant Conduct).  The base offense level must then be determined and any "appropriate specific offense characteristics, cross references, and special instructions" applied in the order listed.  <u>See</u> U.S.S.G. § 1B1.1 (a)(2).

As indicated, § 1B1.2(b) requires that these determinations be made on the basis of all relevant conduct, which includes

> (1)   (A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
>        (B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> . . .
>
> (3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)   any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a).

Relevant conduct is determined under a preponderance-of-evidence standard and may include acquitted conduct.[3] See United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012) ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct."); United States v. Guerra, 888 F.2d 247, 251 (2d Cir. 1989) ("the preponderance of the evidence standard satisfies the requisite due process in determining relevant conduct pursuant to the Sentencing Guidelines"); U.S.S.G. § 6A1.3, Commentary ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

As applicable here, the Probation Officer correctly identified § 2D1.1 as the applicable offense guideline for the drug conspiracy offense of conviction, 21 U.S.C. § 846. (PSR, ¶ 34.)   That guideline contains a cross-reference applicable to drug-trafficking offenses that involve first degree murder.  See U.S.S.G. § 2D1.1(d)(1).  In particular, the cross-reference requires that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such a killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) . . . if the resulting offense level is greater than that determined under [2D1.1]." Id.  In the Probation Officer's view, the evidence at trial established by a preponderance of the evidence that Martinez hired his co-defendants (and others) to kill Quincy Turner, thus

---

[3]Citing United States v. Gigante, Martinez argues that a clear-and-convincing standard applies.  94 F.3d 53 (2d Cir. 1996).  Gigante, however, does not call for a heightened standard, but rather, discusses the role of the weight of evidence proving relevant conduct in considering sentence severity.  See United States v. Cordoba-Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000) (reversing district court that applied clear-and-convincing standard of proof to relevant conduct involving murder in the course of a drug-trafficking offense and distinguishing Gigante line of dicta).

triggering the cross-reference in § 2D1.1(d)(1) and requiring a base offense level of 43. See U.S.S.G. § 2A1.1(a) (providing a base offense level of 43 for first degree murder).

Martinez objects to the calculation of his base offense level in this manner.  First, he argues that the Probation Officer should have calculated his base offense level solely on the basis of the drug conspiracy, without regard to the cross-reference to the first degree murder guideline, because this Court (and not the Probation Officer) should determine whether the cross reference applies.  Second, Martinez argues that the trial evidence does not support the conclusion that he was involved in Quincy Turner's murder.

As to Martinez's first argument, Rule 32(d) of the Federal Rules of Criminal Procedure requires the Probation Officer preparing the PSR to, *inter alia*, "identify all applicable guidelines and policy statements of the Sentencing Commission; calculate the defendant's offense level and criminal history category; and state the resulting sentencing range and kinds of sentences available." Fed. R. Crim. Proc. 32(d)(1)(A)-(C).  As set forth above, the Probation Officer properly applied the guideline provisions in the order prescribed by § 1B1.1, which required consideration of the cross reference applicable to drug-trafficking offenses that involve first degree murder—§ 2D1.1(d)(1).  There is thus no merit to Martinez's argument that the Probation Officer erred by not calculating his base offense level solely on the basis of the drug conspiracy.  Martinez's objection on this basis is therefore denied.

As to Martinez's second argument, this Court concurs with the Probation Officer and finds that Martinez's relevant conduct includes the murder of Quincy Turner, such that the cross-reference in § 2D1.1(d)(1) to the first degree murder guideline (§ 2A1.1(a)) applies. While this Court recognizes that the government failed to convince the jury beyond a reasonable doubt that the defendants killed Turner either to prevent him from cooperating

with law enforcement or in retaliation for him having done so, the trial evidence nonetheless establishes by the much lower preponderance-of-the-evidence standard that Martinez arranged Turner's murder.  See Pica, 692 F.3d at 88 ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct."); United States v. Vaughn, 430 F.3d 518, 526-27 (2d Cir. 2005) (noting that a sentencing court "may consider all information adduced during trial, including acquitted conduct, when sentencing a defendant").

In this Court's view, the credible evidence at trial, both direct and circumstantial, proved the following facts by a preponderance of the evidence.  Martinez and Turner conspired together to traffic cocaine in Jamestown, N.Y.  Martinez supplied Turner kilogram quantities of cocaine, which Turner then supplied to others, including Quentin Leeper.  By way of example, in early 2008, Martinez sold Turner three kilograms of cocaine, which Turner then sold to Leeper.  On another occasion, in March 2008, an individual named Brian Wilson was present when Turner bought cocaine from Martinez in a grocery store parking lot.  The relationship between Martinez and Turner lasted for at least six months and was known in the community.[4]

On March 19, 2008, the day after Martinez sold Turner cocaine in the grocery store parking lot, law enforcement arrested and detained Turner.  Six days later, Turner was released on bond.  He thereafter participated in a proffer session with law enforcement on April 10, 2008, during which he informed law enforcement about his illicit relationship with Martinez.  Turner met with law enforcement for a second proffer session on May 27, 2008.

---

[4]More detailed facts concerning Martinez's drug conspiracy conviction are set forth in Martinez, 2015 WL 5673115, at *1-*2, *4-*6, which is incorporated by reference.

Three days later, he was shot to death.

The evidence at trial indicated that Martinez thought Turner was "snitching" on him after Turner got arrested.  As a result, Martinez solicited Angel Marcial for a contract to kill Turner.  Marcial then recruited Juan DeJesus Santiago.  Santiago then secured, in one way or another, Anthony Maldonado, Diego Correa-Castro, Felix Vasquez, and Carlos Canales to carry out Turner's murder.

Maldonado, Correa-Castro, Vasquez, and Canales first attempted to carry out the contract and murder Turner on May 18, 2008.  The four men traveled together from Rochester, N.Y., to Jamestown, where they met Martinez, who gave them Turner's name, description, and address.  Martinez also paid Vasquez $20,000 for the job.  The four men then proceeded to Turner's house.  Vasquez and Canales, each armed, entered the house, but Turner was not there.  A second attempt to locate Turner that day was unfruitful, so the four men returned to Rochester.

About two weeks later, on May 30, 2008, the four men returned to Jamestown. They again met with Martinez, this time at a hotel.  Martinez directed them to an automotive garage where Turner worked on cars.

After traveling to the garage and watching it for a while, the four men saw Turner emerge and begin working on a car outside.  Vasquez, again armed, exited the vehicle and approached Turner.  After speaking to Turner briefly, Vasquez shot him multiple times, killing him.  Canales, who had also exited the vehicle, shot at individuals in and around the garage.

On their way back to Rochester, the four men called Martinez and told him to watch the news for confirmation that they had killed Turner as directed.

Along with this evidence adduced at trial, this Court further notes that Juan DeJesus

Santiago entered a plea in September 2011 to, among other charges, discharging and using a firearm during and in relation to a crime of violence, that being the murder of Quincy Turner, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  Diego Correa-Castro pled guilty to the same charge for his involvement in Turner's murder, as did Anthony Maldonado. See United States v. Diego Correa-Castro, No. 10-CR-185S, Docket No. 4; United States v. Anthony Maldonado, 08-CR-6210CJS (14), Docket No. 519 .  In support of Santiago's plea, Santiago admitted the truth of the following facts, which largely track the trial evidence:

> That between sometime prior to on or about May 18, 2008, and May 30, 2008, in the Western District of New York, the defendant, JUAN DEJESUS SANTIAGO a/k/a "Javi", did knowingly and unlawfully aid and abet others, including Jose Martinez a/k/a "Noelle", Angel Marcial a/k/a "Bate", Felix Vasquez, Sr. a/k/a "Lolo", Carlos A. Jorge Canales a/k/a "Nito," Anthony Maldonado a/k/a "License" and Diego Correa-Castro, in the knowing and unlawful discharge, use and carrying of firearms.  Specifically, in or before the time period mentioned above, the defendant provided a .45 caliber semi-automatic pistol to "Nito."  That firearm, in addition to other firearms, would be used by "Nito" and others to complete a "contract" on behalf of "Noelle."  Noelle's "contract," which was provided to the defendant by "Bate" and relayed to others, called for the killing of Quincy Turner, an individual whom "Noelle" believe by [sic] was an informant against him.
>
> In furtherance of the contract on May 18, 2008, "Nito," "Lolo," Maldonado and Correa-Castro traveled to Jamestown, New York and met with "Noelle", who provided them with $20,000, the consideration for the contract.  A portion of that "contract" money was later paid to defendant.  While in Jamestown, "Nito," "Lolo," Maldonado and Correa-Castro also received a description of the intended victim, Quincy Turner and drove past the house where Turner lived.  "Noelle" advised them that Turner was "snitching" on him.  After meeting with "Noelle," "Nito" and "Lolo" went to the Turner's residence with firearms, and accosted Turner's family members.  After being unable to locate Turner, "Nito," "Lolo," Maldonado and Correa-Castro all returned to Rochester, New York.

Following the return of "Nito," "Lolo," Maldonado and Correa-Castro to Rochester, the defendant spoke with "Noelle," who inquired when "the contract" would be completed, as the money had already been paid.  After speaking with "Noelle," the defendant contacted "Nito" and directed him and others to return to Jamestown to complete "the contract."  Defendant assured "Noelle" that they would be on their way.  On May 30, 2008, the defendant provided his vehicle to "Nito," "Lolo," Maldonado, and Correa-Castro to finish "the contract."  Upon arriving in Jamestown, "Nito," "Lolo," Maldonado and Correa-Castro again met with "Noelle," who directed them to a garage location that Quincy Turner maintained.  "Noelle" told one or more of those who had arrived to finish "the contract"[,] that he was not going to have anything to do with the murder, that he was going to leave the area, and that he would call his lawyer for an alibi.

After surveilling the garage for a period of time, "Lolo" got out of defendant's car and spoke to Turner outside the garage. After Turner got into his vehicle, "Lolo" shot Turner repeatedly, killing Turner.  "Nito" also got out of the car and started shooting at another man in the garage.  He later said in the vehicle that "he thinks he hit him in the leg."  As they exited the area, "Noelle" was called and told to watch the news, and then "Nito," "Lolo," Maldonado, and Correa-Castro returned to Rochester.  The defendant's vehicle was returned to him , as was the .45 caliber semi-automatic pistol discharged by "Nito." The defendant was told that it was not used but that a 9mm firearm, which the defendant knew "Lolo" possessed, had been the murder weapon.

(Docket No. 160.)

Based on the totality of the trial evidence outlined above and the relevant guilty plea admissions, this Court finds by a preponderance of the evidence that Martinez paid for and arranged Turner's premeditated murder.  See United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (finding that a sentencing court's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come"); United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989) (noting that "[i]t is not a denial of due process for the trial judge, when determining sentence, to

rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine) (citing <u>Williams v. New York</u>, 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949)).  Although Martinez questions the credibility, completeness, and strength of the evidence, this Court finds that, at a minimum, the evidence establishes definitively that Martinez was more likely than not directly responsible for Turner's murder.  Consequently, this Court finds that the Probation Officer correctly considered the murder as part of Martinez's relevant conduct, such that the cross-reference in § 2D1.1(d)(1) to the first degree murder guideline (§ 2A1.1(a)) applies.  Martinez's objection is therefore denied.

## B.      Mitigating Role Reduction

Under § 3B1.2(a), a 4-level downward adjustment can be applied if a defendant was a "minimal participant" in the criminal activity.  A "minimal participant" is one who is "plainly among the least culpable of those involved in the conduct of a group."  U.S.S.G. § 3B1.2, Application Note 4.  A lesser 2-level adjustment can be applied under § 3B1.2(b) if a defendant was a "minor participant" in the criminal activity.  A "minor participant" is one who is "less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2, Application Note 5.  If the defendant's role falls somewhere between that of a minimal and minor participant, a 3-level downward adjustment may be applied.  <u>See</u> U.S.S.G. § 3B1.2.

The above reductions apply to a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant."  <u>See</u> U.S.S.G. § 3B1.2, Application Note 3(A).  This does not describe Martinez, who, as explained above and in this Court's decision denying post-trial motions, was a leader—not a minimal or minor participant—in both the charged drug conspiracy and the plot to murder

Quincy Turner.  See United States v. Martinez, No. 10-CR-233S (1), 2015 WL 5673115 (W.D.N.Y. Sept. 25, 2015).   Accordingly, Martinez's objection to the omission of a mitigating role reduction is denied.

## C.    Acceptance of Responsibility Reduction

Under § 3E1.1(a), a 2-level downward adjustment can be applied if a defendant "clearly demonstrates acceptance of responsibility for his offense."   Importantly, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1(a), Application Note 2. Although conviction after trial does not automatically preclude a defendant from consideration for this reduction, it is only in rare instances, such as proceeding to trial to preserve constitutional or other legal challenges, that this reduction applies after trial.  Id.

Here, Martinez put the government to its proof, as is his constitutional right.   He contested the factual elements of his guilt; he did not proceed to trial only to preserve legal issues for appeal.   Accordingly, this adjustment does not apply.   Martinez's objection is therefore denied.

## IV.  CONCLUSION

For the reasons stated above, the Martinez's objections to the PSR are denied. Martinez's total offense level is 43 and he has a criminal history of II, which yields an advisory guidelines sentencing range of life imprisonment.   Martinez's statutory range is a minimum of 10 years to a maximum of life imprisonment.  See 21 U.S.C. §§ 841(b)(1)(B) and 851.  The advisory guidelines and statutory range for supervised release is eight years. See 21 U.S.C. §§ 841(b)(1)(B) and 851.

**V.  ORDER**

IT HEREBY IS ORDERED, that Defendant Jose Martinez's Objections to the

Presentence Investigation Report (Docket No. 601) are DENIED.

SO ORDERED.


Dated:        August 22, 2016
              Buffalo, New York


                                              s/William M. Skretny
                                           WILLIAM M. SKRETNY
                                           United States District Judge